Case 0:00-cr-06242-KAM    Document 67-3    Entered on FLSD Docket 10/24/2007    Page 1 of 25

```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2
 3   UNITED STATES OF AMERICA,)    Case No.
                              )    00-6242-CR-MARRA
 4              Plaintiff,    )
                              )
 5        -v-                 )
                              )
 6   DAVID DEBERNARDIS,       )
                              )
 7              Defendant.    )    West Palm Beach, Florida
                              )    March 9, 2007
 8   _____ )
 9
10                    TRANSCRIPT OF PROCEEDINGS
11           BEFORE THE HONORABLE KENNETH A. MARRA
12                     U.S. DISTRICT JUDGE
13
14   Appearances:
15   FOR THE GOVERNMENT          Robin Rosenbaum, AUSA
16
     FOR THE DEFENDANT           Lori Barrist, AFPD
17
18   Reporter                    Stephen W. Franklin, RMR, CRR, CPE
     (561)514-3768               Official Court Reporter
19                               701 Clematis Street, Suite 417
                                 West Palm Beach, Florida  33401
20
21
22
23            Exhibit 2
24
25
```

```
 1          (Call to the order of the Court.)

 2               THE COURT:  Good afternoon.  Please be seated.

 3               All right.  We're here in the case of the United

 4     States of America versus David Debernardis, Case Number

 5     00-6242-CR-MARRA.

 6               May I have counsel state their appearances, please.

 7               MS. ROSENBAUM:  Good afternoon, Your Honor.  Robin

 8     Rosenbaum on behalf of the United States of America.

 9               THE COURT:  Good afternoon.

10               MS. BARRIST:  Good afternoon, Your Honor.  Lori

11     Barrist, Assistant Federal Public Defender, on behalf

12     Mr. Debernardis, who cannot stand.

13               THE COURT:  Good afternoon.

14               All right.  We are here for a final hearing on

15     alleged violation of supervised release.

16               Are we ready to proceed?

17               MS. ROSENBAUM:  Your Honor, I have received the

18     papers from the probation officer.  I've discussed this with

19     the probation officer.  I have reviewed the information that

20     Ms. Barrist has obtained, and I've discussed that also with

21     the probation officer.  And after a very careful and detailed

22     review, Your Honor, I don't think that there's been a

23     violation here.

24               What happened in this case, Judge, was that the

25     Defendant was required to report in on his supervised
```

10/22/07 MON 10:47 FAX 305 536 6916     FPD INTERPRETER          →→→ FPD_WPB Office    ☑004
Case 0:00-cr-06242-KAM     Document 67-3     Entered on FLSD Docket 10/24/2007     Page 3 of 25

Page 3

 1    release, and he reported in on October the 23rd.  On October

 2    the 24th he was taken to the hospital, where he remained

 3    until November the 6th, when he was discharged.

 4            On November the 7th, he was again taken to the

 5    emergency room.  On November the 8th, he was again taken to

 6    the emergency room.

 7            On November the 10th was a federal holiday, and the

 8    probation offices -- the courts were closed.  November the

 9    11th was a Saturday.  November the 12th was a Sunday, and

10    November the 13th, which was the first Monday after that, was

11    the day that the Defendant, I believe, reported for his state

12    probation.  At that time he was arrested.

13            The problem, Your Honor, was that probation was not

14    able to learn up until that time that Mr. Debernardis could

15    not physically report because he was in the hospital.  But he

16    did report as soon thereafter as he could, and so, Your

17    Honor, I don't think there's actually a violation.

18            THE COURT:  Okay.  I assume you agree with that,

19    Ms. Barrist?

20            MS. BARRIST:  Yes, Judge.

21            THE COURT:  Then I see no reason to continue with

22    the proceeding, if everyone's in agreement.  I feel bad for

23    the gentleman that he's been in custody for this period of

24    time on a mistake.

25            MS. BARRIST:  Judge, I have a couple requests.

Page 4

1              The first request would be that you terminate his

2      federal probation, since he has to be monitored by the state,

3      the state of Washington, and he has an additional seven

4      months to go out there.  So we just ask that you terminate

5      his --

6              THE COURT:  How long is his probation on this case?

7              PROBATION OFFICER:  Good afternoon, Your Honor.

8      His supervision is due to expire July 21st, 2008.

9              MS. BARRIST:  To be honest with you, I don't know

10     that -- and it's sad to say.  I don't know that he's going to

11     be alive on July 21st, 2008.  If you take a look at the

12     records that I filed from Larkin hospital, which is the

13     hospital that FDC took him to, the number 3 diagnosis there

14     is malignant neoplasm of the bronchus.  I asked my dad, who's

15     a doctor, what that was, and he said that it means he has

16     cancer in his bronchial tubes leading to his lungs.

17             A review of his medical records show that he

18     originally had lung cancer several years ago.  That was in

19     remission.  But now he's got the cancer back in the bronchus,

20     which is leading into the lungs.

21             He has weekly reporting to the state probation

22     office, and in light of that, that's going to go on for the

23     next seven months.  We'd ask that you just terminate his

24     federal probation.

25             THE COURT:  Ms. Rosenbaum?

Page 5

1          MS. ROSENBAUM: Your Honor, to address your

2   question first, if -- I understand from probation there may

3   be a problem with continuing him on supervised release. If

4   there's -- federally, because there's apparently a problem

5   with his being supervised by Seattle, which is where he would

6   be seeking to live, which is where he was originally living

7   at the time that this whole thing happened.

8          So if it's possible for him to be under supervised

9   release, then we would want that to continue, considering his

10   record.

11          If it's not possible, Your Honor, then it's not

12   possible, and we wouldn't be able to ask for it. I'd need to

13   ask Ms. Acosta for her input on that. I don't -- I don't

14   fully understand the relationship between the two offices and

15   why it may not be possible. But that's my understanding from

16   her.

17          THE COURT: In my review of the medical records

18   that Ms. Barrist submitted, I think he indicated to the

19   hospital, in November anyway, that he was planning on

20   returning to Miami. Is that -- have those plans changed, or

21   did I misread the records?

22          MS. BARRIST: He was -- I don't know if that was

23   before, because we were -- he had to go to Miami for these

24   charges. What I was trying to do, if you -- if I couldn't

25   work it out where he could go back to Seattle where the whole

Page 6

1    support system is set up, I was going to ask could he remain

2    at Camilla's House, where he can remain for approximately one

3    week.  But he was -- his whole support system was in Seattle.

4    He was living at the Union Gospel Mission, which is a

5    homeless shelter in Seattle.

6          The investigator from my office, Tom Bazan

7    (phonetic), is in the back.  He spoke to Jeff Yaeger, who was

8    at -- who is the contact manager at the Union Gospel Mission.

9    He verified all the dates that Mr. Debernardis was in there,

10   and he was the one that explained that, yes, when he was

11   released from the hospital, he did, in fact, come back to the

12   Union Gospel Mission.

13         He said that he is eligible to come back and live

14   there for however he needs to be there.  And he said that

15   they care for 150 homeless people.

16         Mr. Bazan also spoke with German Rodriguez.  German

17   Rodriguez is the state social worker in Seattle.  He helped

18   the Defendant -- he was in the process of helping the

19   Defendant apply for SSI benefits out there.  He also helped

20   the Defendant apply for and receive food stamps for

21   September, October, November and December.  Well, not

22   December.  September, October and November, and he could have

23   been receiving them if he's living out there.

24         So his whole support system is out there.  His --

25   where he's going live.  He can live there forever at the

1   Union mission.  His hospitals are out there that he's been

2   to, both Harbor View and Swedish hospital.

3            I already pointed that out.

4            And he said to tell you, and he's dying.  You

5   already know that because I told you that.

6            And I would just ask that you terminate his federal

7   supervision, knowing that he has to report once a week to the

8   state probation.

9            In person, right?

10           THE DEFENDANT:  Yes, three times a week, and I also

11  have to report to the county . . .

12           MS. BARRIST:  Sex offender?

13           THE DEFENDANT:  Sex offenders to sign in every

14  week.

15           MS. BARRIST:  Once a week.

16           THE COURT:  Is there any reason we can't transfer

17  his supervision to the Western District of Washington?

18           PROBATION OFFICER:  Your Honor, I could put a

19  request in to the Western District of Washington to see if

20  they would supervise the individual, with a strong

21  recommendation from Your Honor to have him supervised there.

22  And I would also have my chief make a follow-up phone call to

23  see if they would be willing to accept supervision.

24           THE COURT:  Even if they didn't agree to formally

25  accept supervision, would it be possible for me to permit him

Page 8

1   to reside and have supervision by -- you know, contact by

2   phone from this district?  I mean, is it possible to

3   supervise him at least through telephone contact from long

4   distance?  Otherwise is he going to be required to reside

5   here in this district?

6           PROBATION OFFICER:  Your Honor, I've been unable to

7   locate any homeless programs that will accept him for

8   residency purpose based on his prior criminal record as being

9   a registered sex offender.  So right here in South Florida I

10  do not even have a place to locate him beyond the seven days

11  at Camilla's House.

12          So it would definitely be our recommendation to

13  have him return to Seattle where he did have a support

14  system.

15          We did once try to speak to the deputy chief in the

16  Western District of Washington advising the circumstances

17  before and asked if they would do a courtesy supervision, and

18  they really were not inclined and did not make an attempt to

19  supervise him prior.  That's what the miscommunication has

20  been.  I've been solely relying on the Department of

21  Corrections, who never informed me that he was hospitalized.

22          I can try Monday to contact the Western District of

23  Washington to see whether or not they'd be willing to take

24  him for supervision purposes.  If not, I guess we can put him

25  on a nonreporting supervision until the remaining dates.

Page 9

1    THE COURT:  Okay.  Well, what's going to happen to

2 him once he's released from custody?

3    MS. BARRIST:  That's what I wanted to ask you

4 about.  Pursuant to 18 United States Code 4282, I'm going to

5 ask you to order the marshals to transport him back to

6 Seattle, which is where they brought him from for no reason,

7 in my opinion, in the first place.  4282 allows the Court --

8 it says on the release from custody of a person arrested on a

9 charge of violating any law of the United States or Alaska,

10 but not indicted nor informed against, or indicted or

11 informed against but not convicted and detained, or a person

12 held as a material witness, the Court, in its discretion,

13 might direct the United States Marshal for the district

14 wherein he is released to furnish the person so released with

15 transportation and subsistence to the place of his arrest.

16    So that's 18 United States Code, 4282.  And if it

17 takes some time for them to organize that, I guess, you know,

18 he can -- I don't know if you want to do it from FDC or from

19 the Camilla's House where he can stay for a week.  But since

20 it was not his fault that he was taken --

21    THE COURT:  What is the statute number?

22    MS. BARRIST:  Eighteen United States Code, 4282.  I

23 have a copy if you want it.

24    And he has been in marshal custody now since

25 December 29th -- December 12th.

1              THE COURT:  Ms. Rosenbaum, what are your thoughts

2        on this?

3              MS. ROSENBAUM:  Your Honor, I think it's the right

4        thing to do.  Apparently there was a whole series of

5        miscommunications that led to his being brought all the way

6        across the country.  There's no way for him to get back.

7        There's nowhere for him to be put when he's released from

8        here.  There's a place in Washington.  I think it's the right

9        thing to do.

10             And just so the Court is aware, because I

11       understand why the Court would be concerned that

12       Mr. Debernardis has been held this entire time, part of the

13       problem related, Your Honor, to the fact that he was not well

14       enough physically to be brought to court.  In fact, we tried

15       to bring him to court earlier and they were not able to do

16       that.  He was admitted to the hospital for a stint, and even

17       after he got out I was advised by the Bureau of Prisons that

18       they were not able to move him because he was not in a good

19       state.

20             So I just wanted the Court to be aware of that

21       fact.

22             But getting back to your original question, I do

23       think it's the right thing to do.

24             THE COURT:  Yes, sir?

25             THE MARSHAL:  Michael Wakowski (phonetic), United

1       States Marshal Service.  Do you mind if I take a minute to

2       call and see how they would handle this within the Marshals

3       Service and pursuant to the --

4                  THE COURT:  Sure.

5                  Well, assuming the -- the violation of supervised

6       release charge is being dismissed for --

7                  PROBATION OFFICER:  Yes, Your Honor, we would make

8       that recommendation.

9                  THE COURT:  So I'm going to dismiss the violation

10      -- or the alleged violation and dismiss the petition.  So he

11      needs to be released from custody.  So the question is where

12      he's going to be released.

13                 It would seem to make since that through no fault

14      of his own he was brought back here, he's been held in

15      custody since November, December -- over three months.

16                 MS. BARRIST:  My only problem is if you order his

17      release like today, they're going to roll him out of the

18      front door of the courthouse and there's nothing here in West

19      Palm.

20                 THE COURT:  I understand.

21                 Well, this statute that you just cited, I presume

22      if I order him transported pursuant to that statute, he's no

23      longer in custody but he's still -- the marshals still have

24      to transport him back to Seattle.

25                 MS. BARRIST:  Or --

Page 12

 1              THE COURT:  But he's not in -- he's not being

 2     detained.  I guess he could choose to say, well, I don't want

 3     to get on that plane; I'll stay here in Miami.  I'm ordering

 4     the marshals to do something; I'm not ordering him to do

 5     something.  I guess he doesn't have to go if he doesn't want

 6     to.

 7              THE DEFENDANT:  I'm not going to say that, Your

 8     Honor.

 9              THE COURT:  I understand.

10              But I don't think, in view of his record, I don't

11     feel comfortable at this time terminating his supervision.  I

12     do think we should either try and see if he can be supervised

13     in the Western District of Washington or alternatively put

14     him on nonreporting supervision in the -- you know, hopefully

15     unlikely event that he does do something, that we still

16     have -- we still have some jurisdiction over him.

17              So that would be my suggestion, either put him --

18     see if he will be supervised by the Western District or

19     modify it to nonreporting supervision.  And let's find out

20     about what the marshal's position is going to be about taking

21     him back.

22              I'm sure I'm going to need a written order setting

23     forth certain findings under this statute in order for them

24     to have something to justify their transporting him back.

25     And I don't know how long it takes just to arrange to get him

Page 13

1    on a plane to Seattle. So that's another issue. I guess

2    they're going to have to keep him at FDC until they get him

3    on a plane.

4         MS. BARRIST: The only thing I would say is that

5    either he will stay in jail at the Palm Beach jail if they're

6    going to do it from here, or he can be -- I just don't want

7    him -- I don't want you to say released today.

8         THE COURT: I understand.

9         MS. BARRIST: Or you can say released --

10   transported down to FDC and released to Camilla's House where

11   he'll remain until they organize.

12        THE COURT: Well, I understand Camilla House will

13   only keep him for seven days.

14        MS. BARRIST: How long does it take to get a

15   plane --

16        THE COURT: I don't know. What if it takes longer

17   than that? Then you've got the same problem. He may be on

18   the streets until they find -- they arrange transport. I

19   don't know how long it takes for them to transport somebody.

20        MS. BARRIST: We can make for Mr. Wakowski to come

21   back.

22        PROBATION OFFICER: Your Honor, Camilla's House has

23   a limit at 4:00 p.m. on Friday to take any other individuals

24   for the weekend. His first day that he would be allowed to

25   enter the Camilla's House would be Monday afternoon.

Page 14

1          THE COURT:  All right, thank you.

2          THE MARSHAL:  After -- Mike Wakowski, U.S. Marshals

3     again.

4          I guess they're asking if you're so inclined to

5     order us to return him, if you could, you know, give us an

6     order and also state that, you know, we can give him the

7     funding, he would need to get a ticket and all that.

8          THE COURT:  Get him the funding or --

9          THE MARSHAL:  Well, for us to provide him with the

10    funding, rather than, uh, necessarily the actual

11    transportation; just provide him with the funding to get that

12    transportation when he needs to get back.  Then afterwards I

13    have to call our prisoner services division up in Washington

14    and find out what he's entitled to as a released prisoner.

15         THE COURT:  Would you prefer he make his own travel

16    arrangements or is he going to be able to --

17         MS. BARRIST:  He has nothing.

18         THE COURT:  I understand.  So if someone got him to

19    an airport with a ticket and got him on the plane, I presume

20    someone would be there to -- you said he has a support system

21    there.  Someone could pick him up at an airport in Seattle.

22         MS. BARRIST:  From the Seattle airport there's a

23    free bus that goes right downtown, which he can take to go to

24    the mission.  But my question is how does he get from here to

25    the airport?

Page 15

1          THE COURT:  Well, if they gave him the funding

2    either to buy the ticket and transport or they either

3    physically transport him to the airport and see that he gets,

4    you know, to the plane, or give him the funds to get public

5    or private transportation.

6          It would seem to me that he'd get there faster if

7    he made his own arrangements with your assistance in getting

8    him a plane ticket and they got the money, as opposed to

9    waiting for some kind of transport within the Bureau of

10   Prisons or the Marshals Service.  I don't know.

11         MS. BARRIST:  We're not allowed to handle any money

12   whatsoever.  So that's why I thought that maybe the marshals

13   provide him with the --

14         THE COURT:  That's what he said.  They will provide

15   the funds.

16         MS. BARRIST:  Okay.  And maybe the --

17         You're saying that you would provide him a cab to

18   the airport or drive him there in your marshal car?

19         THE MARSHAL:  We would have to look into that.

20   See, once he's released from custody, he's obviously not

21   going to go to FDC, he's not going to travel on the airlift.

22   He's no longer in custody once the charges are dropped.

23         So that's what we have to look into how that would

24   be handled, and maybe giving him the funds -- you know,

25   getting the appropriate funds to him so he can take care of

Page 16

1    those fares himself or could be purchasing a ticket and

2    getting it to him.

3            THE COURT:  Well, this statute that Ms. Barrist

4    cites, I mean, it presumes the person who's being transported

5    is no longer in custody.  There is either no charge pending

6    or there's been a charge that was brought and it's been

7    dropped.

8            THE MARSHAL:  True.

9            THE COURT:  So even though the person is not being

10   detained or is in custody, the statute says you're still

11   supposed to transport the person where they came from.

12           THE MARSHAL:  Right.  And they may be -- I have to

13   call -- like I said, this isn't the first time I've dealt

14   with it, but last time it was in another district and it was

15   just a matter of driving a guy 60 miles.  So this is a little

16   more involved.  So I just have to look into it.

17           But when I talked to my supervisor or assistant

18   chief, he suggested as far as maybe we could possibly get him

19   the funding, whatever funding he's entitled to, and then that

20   would put it upon him to . . .

21           THE COURT:  All right, well, I'm going to issue a

22   written order under the statute --

23           THE MARSHAL:  Okay.

24           THE COURT:  -- that the marshals are to furnish the

25   person so released with transportation and subsistence to the

Page 17

1    place of his arrest.  And then I'll -- if the marshals and

2    Mr. Debernardis both agree to some alternative means of

3    transportation, I'll, you know, authorize them to do it that

4    way.  But it would have to be you both agree to the

5    alternative means of getting there.

6              THE MARSHAL:  Right.

7              THE COURT:  So I'll give you the option of working

8    something else out.  But if that can't be worked out, then

9    you're going to have to take responsibility for it.

10              THE MARSHAL:  Right.  I understand.  And just,

11    again, they said it could be in an order.

12              THE COURT:  I understand.  I'll have to get a

13    written order together.  So it's going to take me -- I can't

14    do it immediately.  I've got people waiting for a

15    2:00 o'clock hearing.  So I'll try and get that done before

16    the -- and I've got an emergency matter waiting for me in

17    there.

18              So I will get it done this afternoon, though.  Can

19    you stick around?  Or how far away is your office?

20              MS. BARRIST:  Like five minutes.

21              THE COURT:  Okay.  We'll give you a call once the

22    order is done, and we'll get it to the marshals.

23              MS. BARRIST:  Okay.  You know my concern about just

24    not letting him be released today onto the street unless

25    there's a way to get him to the airport, this airport, Palm

Page 18

1    Beach.

2              THE COURT:  Well, do you have any idea based on --

3    based on the charges being dismissed what are they going to

4    do with him in terms of providing him with a place to stay

5    until the transportation is arranged?

6              THE MARSHAL:  Well, that's partly what the issue

7    is.  Once they're released from custody -- I just have to

8    check on it.  I know there's liabilities of transporting

9    people who aren't in custody in our vehicles, because they're

10   no longer under our charge.  If something were to happen, an

11   accident, just issues like that.  I just need to look into

12   it.  I had a quick phone call, but I would look more into it

13   while you're signing the order.

14              If he's still in custody, he's still in custody; we

15   can move him whenever we want.  He's still our charge.  But

16   once he's out of custody, those are the liabilities and

17   issues for us.

18              MS. BARRIST:  How about you release him from

19   custody when he's dropped off at the airport?  That way

20   they're stuck with him until they put him on a plane or a

21   bus?

22              THE MARSHAL:  You know, from where I stand, that

23   sounds fine.  That sounds good.  That puts it on us, and we

24   can move him.

25              Like I said, the big issue is once they've been

1    released from custody. You know, for us, because when they

2    get transported, they're still transportable. Obviously he's

3    not in restraints because he's not able to. But let's say he

4    was somebody else, they would have to be -- they're in

5    custody still. So, I mean, there's issues of keeping someone

6    in custody after they've been released and false imprisonment

7    and issues such as that. That's one of the reasons why once

8    you're cut and released, we release you from our custody.

9         THE COURT: So he would agree to remain in the

10   custody of the U.S. Marshals until he's physically

11   transported to Seattle, Washington?

12        MS. BARRIST: Until he's --

13        THE MARSHAL: Either transported to Seattle

14   Washington or taken to the airport, to a commercial airport.

15        MS. BARRIST: To this airport here, in a Florida

16   airport. I don't know where they're going to fly him out of.

17   I don't know if they're going to fly him out of Miami or

18   they're going to fly him out of Palm Beach. I don't know

19   what goes to Seattle.

20        THE COURT: But if they fly him on a U.S. marshal's

21   plane --

22        MS. BARRIST: He'll never -- yeah?

23        THE COURT: You want him in custody until that

24   happens, right?

25        MS. BARRIST: No. I said he should be in custody

Page 20

1    until they drop him off at the Palm Beach airport with a

2    ticket, or the Miami airport with a ticket and the

3    subsistence.  In other words, their required to be the taxi

4    to the airport.

5            THE COURT:  Okay.  But you're assuming that's the

6    way it's going to be done; that they're going to actually get

7    him a ticket and say, see you, as opposed to physically

8    putting him on their airport and taking him to Seattle.  I

9    don't know which way it's going to happen.

10           MS. BARRIST:  Usually they just give them a bus

11   ticket or a plane ticket.

12           THE MARSHAL:  The marshal doesn't.  BOP might.

13   We're usually -- we cut people, they walk from our office and

14   they're done with us.

15           I don't know.  I need to look into which way the

16   marshals would rather handle it.  I know with the airlift

17   it's not an immediate trip, especially to Seattle.  He'd go

18   to Oklahoma, stay in Oklahoma for, you know, could be a week,

19   could be three weeks, depending on what the priority is and

20   move him, and then he catches another flight from Oklahoma

21   out to whatever loop that would take him to Seattle.  And

22   it's also based on whenever those planes are running.  So

23   it's not a direct route by Marshals Service, if he goes on

24   the regular airlift.  Now, if he goes on one of our

25   commercial -- one of our flights, I'm not sure how the

```
 1     witness -- I mean, how the prisoner service division would

 2     want to handle it.  That's fine.  I'd need to talk to them.

 3              THE COURT:  I'm going to draft an order that gives

 4     you the options to do it either way.

 5              THE MARSHAL:  Okay.

 6              THE COURT:  Whatever works.

 7              MS. BARRIST:  Well, we'd ask that it not be on a

 8     marshal's plane.  It will take another month 'til he gets out

 9     there.

10              THE COURT:  Well, see, you can't have it both ways.

11     You can't say I want you to order the marshals to transport

12     him and then tell them how to do it.

13              MS. BARRIST:  Well, Judge, the statute that you

14     referred to, 4282, refers, like you said, to a person who's

15     been released from custody.  They're not going to transport a

16     person who's been released from custody.  They give them an

17     airplane ticket or a bus ticket.

18              THE COURT:  You know that?

19              MS. BARRIST:  I've had one or two cases where the

20     person gets out -- when I was in Miami, not here, because

21     nobody gets out here.

22              THE COURT:  I don't know how they do it.

23              THE MARSHAL:  You know, and until I speak with

24     them, I'm not sure either.  But I don't see the Marshals

25     Service moving him through our normal methods once he's been
```

1    released from custody.  Now, if the order read that he's

2    released from custody once he reached Seattle or once we got

3    him to Seattle, then he'd still be in custody.  But if he's

4    no longer in our custody, I don't think we would move them

5    through that method.  I don't know.  I haven't spoken to our

6    people how they do it.

7            THE COURT:  The problem is she wants him to stay in

8    custody until we put him on a plane.

9            THE MARSHAL:  I understand that.

10           MS. BARRIST:  A commercial plane, Judge, a

11   commercial plane, you know, like American Airlines or

12   something.

13           THE COURT:  What if they say we don't have the

14   means of doing that; we have to transport him on our own

15   planes.

16           MS. BARRIST:  Or a bus.  They have money for a bus

17   ticket.

18           THE COURT:  I don't know what they have.  Do you

19   know what they have?  You're assuming -- you know, this is

20   the Governmental bureaucracy at work here.  They have rules

21   and regulations.  They may not have funds to just go buy a

22   ticket for him.  They may say we have to do it through

23   Oklahoma through our own system.  I don't know.  You know,

24   just because it makes sense doesn't mean that's the way it's

25   going to work is to give him a ticket and put him on a plane

Page 23

1    in Miami.

2              So I want to -- I want to cover all the options so

3    that once I sign the order they're not going to say, oh,

4    well, it says this and this is the only way we have to do it,

5    we have to do it this way.  I want to give them the option of

6    doing it whatever way makes sense.

7              MS. BARRIST:  Okay.

8              THE COURT:  But everybody would rather give him a

9    ticket and put him on a plane here in Miami or put him on a

10   plane somewhere in South Florida and send him to Seattle, and

11   that will be the end of it.

12             THE MARSHAL:  Yeah, that'd be preferred, but . . .

13             THE COURT:  And he's going to be in your custody

14   until he's on that plane, or he's at the airport.

15             THE MARSHAL:  Something like that, yeah, would work

16   out probably easiest.  I don't know.  Like I said, I need to

17   make some phone calls once we break from here and see how

18   it's normally handled.  It's just something new to us.

19             THE COURT:  I'm sorry, you've been standing there,

20   waiting to talk.

21             PROBATION OFFICER:  Your Honor, may I recommend

22   that maybe we keep this petition still active and once he

23   does arrive to Seattle, the custody issue's been addressed

24   and then I can withdraw the petition, or put a request in to

25   withdraw the petition, so that way we do address the custody

Page 24

1    issues so the marshals will be able to transport him to

2    Seattle?

3              THE COURT:  But then he's going stay in custody

4    until the petition's withdrawn.  So that means they have to

5    transport -- they have to transport him; they can't put him

6    on a plane.

7              MS. BARRIST:  Well, we would obviously object to

8    that one.  I'd like the marshal's suggestion better.

9              PROBATION OFFICER:  If they have the money.

10             THE MARSHAL:  I like the open-ended suggestion.

11             THE COURT:  I'll try and get an order drafted this

12   afternoon that addresses all these issues, and I'll let you

13   know when it's prepared.

14             MS. BARRIST:  Okay.

15             THE COURT:  I'll get it to the marshals this

16   afternoon.

17             THE MARSHAL:  Thank you, Your Honor.

18             THE COURT:  Thank you.

19             Good luck to you, sir.

20        (Proceedings concluded.)

21

22

23

24

25

Page 25

1                        * * * * *

2                      CERTIFICATE

3       I, Stephen W. Franklin, Registered Merit Reporter, and

4    Certified Realtime Reporter, certify that the foregoing is a

5    correct transcript from the record of proceedings in the

6    above-entitled matter.

7       Dated this 22nd day of OCTOBER, 2007.

8

9       _____

        Stephen W. Franklin, RMR, CRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25